Sheehan & Associates, P.C.
Spencer Sheehan
spencer@spencersheehan.com
60 Cuttermill Rd Ste 409
Great Neck, NY 11021
Telephone: (516) 268-7080

| | |
|---|---|
| United States District Court<br>Eastern District of New York | 1:20-cv-05606 |
| Robert Kushner, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>    - against -<br><br>Monster Energy Company,<br><br>       Defendant | Complaint |

   Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

   1.  Monster Energy Company ("defendant") manufactures, distributes, markets, labels and sells coffee-based energy drinks purporting to be flavored with vanilla and having a vanilla taste, under its Java 300 product line - French Vanilla, Java 300 Triple Shot ("Product").

   2.  The Product is sold by retailers and online stores of third-parties nationwide.

   3.  The relevant label representations include "French Vanilla," "Java Monster," "300" and "Triple Shot."



4. Unfortunately for consumers, the Product is not flavored mainly from vanilla beans and as a result, does not taste like vanilla.

5. Demand for real vanilla "has been steadily increasing…due to consumer demand for natural foods that are free of artificial ingredients."[1]

6. According to one flavor supplier, today's consumers "want real vanilla, not imitation [vanilla] flavoring."

7. Vanilla comes from an orchid plant grown in the tropics.

---

[1] Chagrin Valley Soap & Salve Company, FAQs, Why Are The Prices of Vanilla Bean Products Always Increasing?

8. The fruit pod of the vanilla flower is the vanilla bean, the raw material for vanilla flavorings.

9. The vanilla bean is heated in the sun for weeks, soaked in alcohol and its flavor constituents extracted (vanilla extract).

10. The popularity of vanilla in the 19th century led to the isolation of the most predominant flavor component, vanillin.

11. However, vanillin separated from the rest of the vanilla bean does not constitute vanilla flavor.

12. Sensory evaluation of vanillin is mainly sweet, with a lackluster "chemical-like" taste and odor because it lacks the other molecules in vanilla.

13. Vanillin must be accompanied by other compounds to produce the familiar flavor and aroma consumers are accustomed to as vanilla.

14. The availability of low-cost vanillin resulted in foods purporting to contain vanilla, which either contained no vanilla or a trace or *de minimis* amount, boosted by synthetic vanillin.

15. Vanilla's unique and complex flavor is due to the many odor-active compounds including acids, ethers, alcohols, acetals, heterocyclics, phenolics, hydrocarbons, esters and carbonyls, shown in the table below for a sample of vanilla extract.

| MS Scan # | Area Integration | Peak Assignment | Peak Area % |
|---|---|---|---|
| 67 | 16132 | hexanal | 0.0206 |
| 71 | 16235 | butanediol isomer | 0.0207 |
| 81 | 57370 | butanediol isomer | 0.0732 |
| 103 | 36387 | 3-methylbutyric acid | 0.0464 |
| 115 | 33053 | furfural | 0.0422 |
| 141 | 27408 | butanal, diethyl acetal | 0.0350 |
| 262 | 18390 | 3-methylbutanal, diethyl acetal | 0.0235 |
| 281 | 25224 | hexanoic acid | 0.0322 |
| 289 | 2729 | methyl furfural | 0.0035 |
| 299 | 52183 | phenol + trace of benzaldehyde | 0.0665 |
| 349 | 2385 | 1H-pyrrole-2-carboxaldehyde | 0.0030 |
| 379 | 47287 | limonene + benzyl alcohol | 0.0603 |
| 397 | 13835 | heptanoic acid | 0.0176 |
| 409 | 31102 | gamma-hexalactone | 0.0397 |
| 415 | 19338 | p-cresol | 0.0247 |
| 425 | 4470 | hexanal, diethyl acetal | 0.0057 |
| 443 | 287479 | guiaicol | 0.3666 |
| 453 | 5947 | nonanal | 0.0076 |
| 477 | 10000 | phenylethyl alcohol | 0.0128 |
| 496 | 112067 | ? | 0.1429 |
| 505 | 44668 | benzoic acid + octanoic acid | 0.0570 |
| 522 | 4551 | diethyl succinate | 0.0058 |
| 536 | 2461 | ethyl benzoate | 0.0031 |
| 544 | 11769 | 1,2-benzenediol | 0.0150 |
| 555 | 145356 | 2-methoxy-4-methylphenol | 0.1854 |
| 567 | 2537 | methyl salicylate | 0.0032 |
| 587 | 8552 | hydroxy methyl furfural (HMF) | 0.0109 |
| 594 | 5555 | benzeneacetic acid | 0.0071 |
| 605 | 101562 | nonanoic acid | 0.1295 |
| 624 | 6802 | hydroquinone | 0.0087 |
| 631 | 3864 | 4-methoxybenzaldehyde (p-anisaldehyde) | 0.0049 |
| 642 | 6356 | ethyl nonanoate | 0.0081 |
| 653 | 53264 | 4-methoxybenzyl alcohol (p-anisyl alcohol) | 0.0679 |
| 676 | 14481 | cinnamyl alcohol | 0.0185 |
| 685 | 16094 | 3-hydroxybenzyl alcohol | 0.0205 |
| 718 | 12188570 | 3-hydroxybenzaldehyde + 4-ethoxymethylphenol | 15.5440 |
| 751 | 122634 | methyl cinnamte | 0.1564 |
| 759 | 60715743 | vanillin | 77.4301 |
| 796 | 90669 | methyl-p-methoxybenzoate (methyl paraben) | 0.1156 |
| 809 | 2228588 | vanillyl ethyl ether + trace of 4-hydroxy-3-methoxybenzyl alcohol | 2.8421 |
| 832 | 224829 | p-hydroxybenzoic acid | 0.2867 |
| 839 | 37335 | acetovanillone | 0.0476 |
| 892 | 950342 | vanillic acid | 1.2120 |
| 909 | 405589 | 3,4-dihydroxybenzaldehyde | 0.5172 |
| 935 | 82429 | 3,4-dihydroxy-5-methoxybenzaldehyde | 0.1051 |
| 954 | 6212 | ethyl homovanillate | 0.0079 |
| 975 | 78148 | syringealdehyde | 0.0997 |
| 1266 | 14130 | ethyl palmitate | 0.0180 |
| 1518 | 21477 | ethyl linoleate | 0.0274 |
|  | 78413588 | Total | 100.0000 |

16. While vanillin (MS Scan # 759, 77.4301 Peak Area %) plays a significant role, it contributes less than one-third of the overall flavor/aroma impact of vanilla.

17. Methyl cinnamate (MS Scan # 751) and cinnamyl alcohol (MS Scan # 676, 0.0185) provide cinnamon and creamy notes to vanilla.

18. P-cresol (MS Scan # 415, 0.0247) provides woody and spicy notes.

19. Acetovanillone (MS Scan # 839, 0.0476) provides a sweet, honey taste.

20. P-hydroxybenzoic acid (MS Scan # 832, 0.2867) and vanillic acid (MS Scan # 892, 1.2120) are significant phenolic compounds which contribute to vanilla's aroma.

4

21. 4-methoxybenzaldehyde (p-anisaldehyde) (MS Scan # 631, 0.0049) provides creamy flavor notes to vanilla.

22. 4-methoxybenzyl alcohol (p-anisyl alcohol) (MS Scan # 653, 0.0679) provides floral notes.

23. Consumer and industry groups have long sought to prevent the deceptive practice where consumers are sold a food flavored as "vanilla" only to discover too late it lacks the richness and layered taste only provided by flavor from vanilla beans.

24. The earliest effort to prevent fraud in vanilla products was the U.S. Pharmacopeia standard, which required a specific weight of vanilla beans as the source for vanilla extract.

25. The focus was on the weight of actual vanilla beans, because this would prevent companies from adding vanillin to a small amount of vanilla beans.

26. However, consumer deception continued, as companies regularly labeled foods as "vanilla" despite containing no, or trace amounts of vanilla.

27. Congress authorized regulations to prevent such deceptive labeling, and for over fifty (50) years, most companies adhered to these industry standards.

28. This meant consumers were told that a product purported to be flavored as "vanilla" but not containing vanilla and/or containing artificial vanilla would be labeled as flavored with imitation vanilla or artificially flavored.

29. These regulations established custom and practice so that consumers' experience primed them to infer from a product's labeling whether the flavor source was entirely from the characterizing vanilla bean ingredient or not.

30. For instance, when a food was labeled "vanilla" without qualification, consumers understood that the flavoring was only from vanilla beans.

31. In early 2018, in response to reports of a surge in fraudulent vanilla flavored foods, the flavor industry – The Flavor and Extract Manufacturers Association of the United States or "FEMA" – urged companies to return to truthfully labeling vanilla foods so consumers would not be misled by artificial vanilla flavors where foods were labeled only with "vanilla." *See* John B. Hallagan and Joanna Drake, FEMA, "[Labeling Vanilla Flavorings and Vanilla-Flavored Foods in the U.S.](#)," Perfumer & Flavorist, Vol. 43 at p. 46, Apr. 25, 2018 ("Hallagan & Drake").

32. Based on the term "[French] Vanilla" and the absence of any qualifying terms, reasonable consumers, and Plaintiff, expected the Product to have a vanilla taste provided by vanilla beans.

33. Though the Product's ingredient list states "Natural Flavors (Contains Vanilla Extract)," this does not clarify nor disclose to consumers that even though it *may* contain a trace of real vanilla, the majority of the flavoring comes from artificial vanilla flavors and as a result, does not taste like vanilla.

INGREDIENTS: BREWED COFFEE (FILTERED WATER, COFFEE), SKIM MILK, SUGAR, CREAM, GLUCOSE, TAURINE, NATURAL FLAVORS (CONTAINS VANILLA EXTRACT), SODIUM BICARBONATE, PANAX GINSENG FLAVOR, MICROCRYSTALLINE CELLULOSE, SODIUM CITRATE, CAFFEINE, CARRAGEENAN, CALCIUM ALGINATE, NIACINAMIDE (VIT. B3), SODIUM ALGINATE, INOSITOL, L-CARNITINE L-TARTRATE, PYRIDOXINE HYDROCHLORIDE (VIT. B6), SUCRALOSE, RIBOFLAVIN (VIT. B2). CONTAINS MILK Ⓤ D

**INGREDIENTS:** BREWED COFFEE (FILTERED WATER, COFFEE), SKIM MILK, SUGAR, CREAM, GLUCOSE, TAURINE, NATURAL FLAVORS (CONTAINS VANILLA EXTRACT), DIPOTASSIUM PHOSPHATE, MICROCRYSTALLINE CELLULOSE, PANAX GINSENG FLAVOR, SODIUM BICARBONATE, SODIUM CITRATE, CARRAGEENAN, CAFFEINE, CALCIUM ALGINATE, NIACINAMIDE (VIT. B3), SODIUM ALGINATE, INOSITOL, L-CARNITINE L-TARTRATE, PYRIDOXINE HYDROCHLORIDE (VIT. B6), SUCRALOSE, RIBOFLAVIN (VIT. B2).

34. Analysis of the Product reveals an abnormal excess of vanillin relative to the amount and presence of the key odor-active compounds in authentic vanilla, which is a strong indicator it contains vanillin from non-vanilla sources.

35. For instance, the Product fails to reveal detectable levels of one or more compounds including methyl cinnamate, cinnamyl alcohol, p-cresol, p-hydroxybenzoic acid, 4-methoxybenzaldehyde (p-anisaldehyde), 4-methoxybenzyl alcohol (p-anisyl alcohol) and/or vanillic acid.

36. This means that the Product *may* contain a trace or de minimis amount of vanilla but is boosted by synthetic vanillin from wood pulp or petroleum derivatives.

37. The representation as "[French] Vanilla" is false, deceptive and misleading because consumers expect the designation of vanilla without qualifying terms – "flavored," "other natural flavors" – to mean the flavor source is exclusively and/or predominantly from vanilla beans.

38. Most products sold today contain such statements, so their absence is notable to consumers.

39. Second, because vanillin is responsible for less than one-third of the overall flavor/aroma impact of vanilla, it is false and misleading to describe the Product's taste as "vanilla" because it lacks detectable level of the above-identified odor-active compounds that are critical to the expected vanilla taste.

40. Third, the representation of "vanilla" is misleading because the Product contains added vanillin, not from vanilla beans.

41. Natural vanillin is only from vanilla beans, which means vanillin from non-vanilla sources is artificial.

42. According to the legal counsel for FEMA, John Hallagan, federal regulations,

7

mirrored by those of this state, require a food such as Defendant's Product, that purports to taste like vanilla, to disclose the presence of the artificial flavor, vanillin.

43. Hallagan provides an example of a "vanilla-tasting cookie (vanilla is the characterizing flavor)" which contains some vanilla and added vanillin from non-vanilla.

44. Since vanillin is characterizing for vanilla, "the labeling for the cookie on the principal display panel must indicate" it is artificially flavored because it contains vanillin not from vanilla beans.[2]

45. Likewise, Defendant's French Vanilla Java is labeled as vanilla even though it contains vanillin not from vanilla beans, which means it should be labeled as "artificially flavored."

46. Consumers expect to be told the Product is artificially flavored because vanilla's taste is not synonymous with vanillin.

47. Consumers prefer foods flavored with ingredients that are more natural and less processed, and vanillin is highly processed in a laboratory and made with chemical additives.

48. By omitting "artificially flavored" from the front label, consumers are not told that the (1) taste is not provided exclusively or predominantly from vanilla beans and (2) that the Product fails to taste like vanilla because it lacks the above-described odor-active compounds.

49. Fourth, the Product's ingredient list prevents consumers from learning the truth about the "vanilla" taste.

50. Because the Product contains added vanillin, the ingredient list should indicate "natural and artificial flavors."

51. Consumers who read the ingredient listing of "natural flavors (contains vanilla

---

[2] Hallagan and Drake, p. 52.

8

extract)" will not be told that the flavors included with the vanilla extract are artificial vanilla flavors, not from vanilla beans.

52. Consumers are entitled to know "whether the product [they are buying] is flavored with a vanilla flavoring derived from vanilla beans, in whole or in part, or whether the food's vanilla flavor is provided by flavorings not derived from vanilla beans."[3]

53. Defendant knows consumers will pay more for the Product because the front label only states "vanilla" and not "artificially flavored" and "does not taste like real vanilla."

54. Defendant's omission and failure to disclose these facts is deceptive and misleading to consumers who want a vanilla flavored product that contains flavoring exclusively and/or predominantly from vanilla beans and tastes like vanilla.

55. Vanillin is found by plaintiff and consumers to taste harsh and lack the depth of real vanilla.

56. Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud plaintiff and consumers.

57. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

58. The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

59. Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for them.

60. As a result of the false and misleading labeling, the Product is an sold at a premium price, approximately no less than $ 2.49 per 15 OZ, excluding tax, compared to other similar

---

[3] Id.

products represented in a non-misleading way, and higher than the price of the Product if it were represented in a non-misleading way.

## Jurisdiction and Venue

61. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2)

62. Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

63. Plaintiff Robert Kushner is a citizen of New York.

64. Defendant Monster Energy Company, is a Delaware corporation with a principal place of business in Corona, Riverside County, California and is a citizen of California.

65. "Minimal diversity" exists because plaintiff Robert Kushner and defendant are citizens of different states.

66. Upon information and belief, sales of the Product in New York exceed $5 million per year, exclusive of interest and costs, and the aggregate amount in controversy exceeds $5 million per year.

67. Venue is proper in this judicial district because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claim occurred here.

68. Venue is further supported because many class members reside in this District.

## Parties

69. Plaintiff Robert Kushner is a citizen of New York, Staten Island, Richmond County.

70. Defendant Monster Energy Company is a Delaware corporation with a principal place of business in Corona, California, Riverside County and is a citizen of California.

71. During the relevant statutes of limitations for each cause of action alleged, plaintiff purchased the Product within his district and/or State for personal and household consumption and/or use in reliance on the representations of the Product.

72. Plaintiff purchased the Product on more than one occasion, including in or around February 2020, at Mike Food Deli Corp. store at 100 Stuyvesant Pl, Staten Island, NY 10301.

73. Plaintiff bought the Product at or exceeding the above-referenced price because he liked the product for its intended use and relied upon the front label claims, expected a vanilla taste, and that such taste would come exclusively and/or predominantly from vanilla beans and did not expect a taste of vanillin, provided by artificial vanilla flavors.

74. Plaintiff was deceived by and relied upon the Product's deceptive labeling.

75. Plaintiff would not have purchased the Product in the absence of Defendant's misrepresentations and omissions.

76. The Product was worth less than what Plaintiff paid for it and he would not have paid as much absent Defendant's false and misleading statements and omissions.

77. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance that Product's labels are consistent with the Product's components.

## Class Allegations

78. The class will consist of all purchasers of the Product who reside in New York during the applicable statutes of limitations.

79. Plaintiff seek class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

80. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

81. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

82. Plaintiff is an adequate representatives because his interests do not conflict with other members.

83. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

84. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

85. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

86. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York GBL §§ 349 & 350</u>
(Consumer Protection from Deceptive Acts)

87. Plaintiff incorporates by reference all preceding paragraphs.

88. Plaintiff and class members desired to purchase and consume products which were as described and marketed by defendant and expected by reasonable consumers, given the product type.

89. Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

90. Defendant misrepresented the substantive, quantitative, qualitative, compositional and/or organoleptic attributes of the Product.

91. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect the Product to be flavored by sources which were not predominantly vanilla beans and expect a Product that

12

tastes like vanilla, because that is what the front label said – "Vanilla."

92. Plaintiff relied on the statements, omissions and representations of defendant, and defendant knew or should have known the falsity of same.

93. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Negligent Misrepresentation

94. Plaintiff incorporates by reference all preceding paragraphs.

95. Defendant misrepresented the substantive, quantitative, qualitative, compositional and/or organoleptic attributes of the Product.

96. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect artificial vanilla because it was not stated on the front label or ingredient list, where consumers are accustomed to looking and seeing this information.

97. Defendant had a duty to disclose the non-vanilla, artificial flavors and tell consumers the Product did not taste like vanilla because it lacked sufficient amounts of the compounds which provide the characteristic vanilla taste.

98. This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product type.

99. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

100. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

101. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty, Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

102. Plaintiff incorporates by reference all preceding paragraphs.

103. The Product was manufactured, labeled and sold by defendant or at its express directions and instructions, and warranted to plaintiff and class members that they possessed substantive, quality, organoleptic, and/or compositional attributes it did not.

104. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

105. This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

106. Plaintiff provided or will provide notice to defendant, its agents, representatives, and their employees.

107. Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years regarding the Product, of the type described here.

108. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

109. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

110. Plaintiff incorporates by reference all preceding paragraphs.

111. Defendant misrepresented the substantive, quality, compositional and/or

14

organoleptic attributes of the Product.

112. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect a product labeled as "Vanilla" to be flavored mainly from artificial vanillin and therefore not taste like vanilla.

113. Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front label and ingredient list, when it knew its statements were neither true nor accurate and misled consumers.

114. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Unjust Enrichment

115. Plaintiff incorporates by reference all preceding paragraphs.

116. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the

15

applicable laws;

4. Awarding monetary damages and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   November 17, 2020

                        Respectfully submitted,

                        SHEEHAN & ASSOCIATES, P.C.

                        /s/ Spencer Sheehan
                        Spencer Sheehan
                        spencer@spencersheehan.com
                        60 Cuttermill Rd Ste 409
                        Great Neck, NY 11021
                        Telephone:  (516) 268-7080
                        Facsimile:   (516) 234-7800

1:20-cv-05606
United States District Court
Eastern District of New York

Robert Kushner, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Monster Energy Company,

Defendant

Complaint

Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: November 17, 2020

/s/ Spencer Sheehan
Spencer Sheehan